Case Nos. 12-10500; 12-10514; 12-10558
(consolidated with Nos. 12-10492; 12-10493; 12-10559; 12-10560)

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

## AU OPTRONICS CORPORATION, *et al.*,
*Defendants-Appellants-Cross-Appellees*,

### v.

## UNITED STATES OF AMERICA,
*Defendant-Appellee-Cross-Appellant.*

---

On Appeal from the United States District Court
for the Northern District of California, No. 3:09-cr-00110-SI
District Judge Susan Illston

---

## BRIEF OF *AMICUS CURIAE* OF PROFESSOR ANDREW GUZMAN IN SUPPORT OF APPELLANTS, URGING REVERSAL

---

Dr. Chang C. Chen
The Law Offices of Chang C. Chen
500 Bryant Street, Suite 104
San Francisco, CA 94107
Telephone: (415) 990-1858
Facsimile: (714) 795-2995

John Shaeffer
Carole E. Handler
LATHROP & GAGE LLP
1888 Century Park East, Suite 1000
Los Angeles, CA 90067
Telephone:  (310) 789-4600
Facsimile:  (310) 789-4601

Sang N. Dang
Andrew B. Chen
BLUE CAPITAL LAW FIRM, PC
600 Anton Boulevard, Suite 1000
Costa Mesa, CA 92626
Telephone: (714) 839-3800
Facsimile: (714) 795-2995

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ............................................................... 1

STATEMENT OF FACTS ............................................................... 3

ARGUMENT ............................................................... 5

   I.  SECTION ONE OF THE SHERMAN ACT SHOULD NOT BE
      APPLIED EXTRATERRITORIALLY IN CRIMINAL CASES ........ 5

   II.  PRINCIPLES OF INTERNATIONAL LAW AND
      INTERNATIONAL COMITY COUNSEL AGAINST CRIMINAL
      SANCTIONS BEING APPLIED AGAINST THESE TAIWANESE
      INDIVIDUALS FOR ACTIONS TAKEN IN TAIWAN .................. 11

   III. EXTRATERRITORIAL APPLICATION OF THE SHERMAN ACT
      UNDER THESE FACTS IS CONTRARY TO SOUND POLICY
      AND SENSIBLE REGULATION OF GLOBAL COMMERCE ..... 17

   IV. COOPERATION AND CONSULTATION ....................................... 20

   V.  CONCLUSION .................................................................... 22

CERTIFICATE OF COMPLIANCE ............................................................ 23

i

# TABLE OF AUTHORITIES

**Cases**

*EEOC v. Arabian American Oil Co.,*
  499 U.S. 244, 111 S.Ct. 1227 (1991) ...................................................... 5, 6

*F. Hoffmann-La Roche Ltd. V. Empagran S.A.,*
  542 U.S. 155, 124 S.Ct. 2359 (2004) ............................................. 8, 18, 19

*Foley Bros., Inc. v. Filardo,*
  336 U.S. 281, 69 S.Ct. 575 (1949) ............................................................. 5

*Hartford Fire Ins. Co. v. California,*
  509 U.S. 764, 23, 113 S.Ct. 2891 (1993) .......................................... passim

*Hilton v. Guyot,*
  159 U.S. 113 (1895) .................................................................................. 13

*Metro Industries, Inc. v. Sammi Corp.,*
  82 F.3d 839 (9th Cir. 1996) ....................................................................... 14

*Morrison v. National Australia Bank, Ltd.,*
  __ U.S. __, __, 130 S.Ct. 2869 (2010) ......................................... 6, 7, 9, 22

*Murray* v. *The Schooner Charming Betsy,*
  6 U.S. (2 Cranch) 64 (1804) ............................................................... 11, 12

*Sale v. Haitian Centers Council, Inc.,*
  509 U.S. 155, 113 S.Ct. 2549 (1993) ......................................................... 6

*Smith v. United States,*
  507 U.S. 197, 204, 113 S.Ct. 1178 (1993) .................................................. 5

*United States v. Bowman,*
  260 U.S. 94, 43 S.Ct. 39 (1922) ............................................................... 10

*United States* v. *Neil,*
  312 F.3d 419 (9th Cir. 2002) ..................................................................... 11

*United States v. United States Gypsum Co.*,
  438 U.S. 422, 98 S.Ct. 2864 (1978) ......................................... 10

**Statutes & Other Authorities**

22 BERKELEY J. INT'L L. 355 (2004) ............................................... 1

*A Strategy for Cooperation in Global Competition Policy*, Regulation and
  Competition in the Global Economy: Cooperation, Comity, and
  Competition Policy (Andrew T. Guzman, ed.) (2010)................................ 1

Antitrust & trade Reg. Rep.
  (BNA) F-1 (April 10, 1980) ..................................................... 15

*Antitrust and International Regulatory Federalism*,
  76 N.Y.U. L. Rev. 1142 (2001) .................................................. 1

*Choice of Law: New Foundations,*
  90 Geo. L.J. 883 (2002) ....................................................... 1

Fair Trade Act of 2011 of Taiwan, Arts. 7 ...................................... 17

Born, Gary B. & Rutledge, Peter, International Civil Litigation in United
  States Courts 648 (4th ed. 2007) ........................................... 15, 16

H.R. Rep. 97-686 ............................................................... 7

*International Antitrust and the WTO: The Lesson from Intellectual Property,*
  43 Va. J. Int'l L. 933 (2003) ................................................ 1

*International Competition Law*, RESEARCH HANDBOOK IN INTERNATIONAL
  ECONOMIC LAW (Andrew T. Guzman & Alan O. Sykes, eds., 2007)......... 1

*International Regulatory Harmonization*, Introduction to Symposium,
  3 Chi. J. Int'l L. 271 (2002) ................................................ 1

*Is International Antitrust Possible?*,
  73 N.Y.U. L. Rev. 1501 (1998) ................................................ 1

James A. Wilson, *Extradition: The New Sword or the Mouse That Roared?,*
  Antitrust Source, Apr. 2011 ................................................. 12

John B. Sandage, *Forum Non Conveniens and the Extraterritorial Application of United States Antitrust Law*,
94 Yale L. J. 1693 (1985) .......................................................................... 15

Phillip E. Areeda & Herbert Hovemkamp, II Antitrust Law
¶ 303c, p.42 (3d ed. 2006) ........................................................................ 11

*Public Choice and International Regulatory Competition*,
90 Geo. L.J. 971 (2002) .............................................................................. 1

*Reflections on Cartel Enforcement*,
27-FALL Antitrust 33, 37 (2012) ................................................................ 8

Restatement (Third) of Foreign Relations Law § 403 (1987) .......... 10, 12, 14

Taiwan Fair Trade Comm'n, Explanatory Material Relevant to the Revised
Articles of the Fair Trade Act, § 3.1 (1999) .............................................. 16

Taiwan Fair Trade Commission website,
http://www.ftc.gov.tw/internet/english/doc/docList.aspx?uid=1075 ........ 21

*The Case for International Antitrust, in* Competition Law In Conflict:
Antitrust Jurisdiction In The Global Economy (Michael Greve & Richard
Epstein, eds. 2004) .................................................................................... 1

United Kingdom's Protection of Trading Interests Act, (U.K.), 1980 ......... 15

United States Department of Justice website, Antitrust Division,
http://www.justice.gov/atr/public/international/int-arrangements.html.... 21

William Dodge, *Extraterritoriality and Conflict-of-Laws Theory: An
Argument for Judicial Unilateralism*,
39 Harv. Int'l L. J. 101, 164 (1998) .......................................................... 15

## INTEREST OF AMICUS CURIAE[1]

Professor Andrew Guzman is a law professor at the University of California, Berkeley.  He teaches and has written extensively on the subject of international jurisdiction and conflicts of law.[2]  As an expert in international law, he seeks to promote an approach to the regulation of economic activity in United States courts that is based on jurisdiction principles recognized by international law and consistent with sound domestic policies in a global environment.

The court below imposed crippling antitrust fines and caused the domestic imprisonment of foreign citizens for allegedly taking part in a

---

[1] Pursuant to Fed. R. App. P. 29(a), all parties have consented to the filing of this brief.  No person other than *Amicus Curiae* or his counsel authored this brief in whole or in part, or made a monetary contribution to its preparation or submission.

[2] *See A Strategy for Cooperation in Global Competition Policy*, Regulation and Competition in the Global Economy: Cooperation, Comity, and Competition Policy (Andrew T. Guzman, ed.) (2010); *International Competition Law*, *in* RESEARCH HANDBOOK IN INTERNATIONAL ECONOMIC LAW (Andrew T. Guzman & Alan O. Sykes, eds., 2007); *The Case for International Antitrust,* Competition Law In Conflict: Antitrust Jurisdiction In The Global Economy (Michael Greve & Richard Epstein, eds. 2004) (reprinted in 22 BERKELEY J. INT'L L. 355 (2004)); *International Antitrust and the WTO: The Lesson from Intellectual Property,* 43 Va. J. Int'l L. 933 (2003); *Choice of Law: New Foundations,* 90 Geo. L.J. 883 (2002); *Public Choice and International Regulatory Competition*, 90 Geo. L.J. 971 (2002); *International Regulatory Harmonization*, Introduction to Symposium, 3 Chi. J. Int'l L. 271 (2002); *Antitrust and International Regulatory Federalism*, 76 N.Y.U. L. Rev. 1142 (2001); *Is International Antitrust Possible?*, 73 N.Y.U. L. Rev. 1501 (1998).

foreign conspiracy, regardless of any impact on United States commerce.

*Amicus* seek both clarification by this Court of the applicable standards and reversal of the decision below.

## STATEMENT OF FACTS

From 2001 to 2006, representatives from six Taiwanese and Korean thin-film transistor liquid crystal display (TFT-LCD) manufacturers met in so-called "Crystal Meetings" for the purpose of discussing market conditions and pricing in the TFT-LCD market.  The meetings in question were held in Taiwan.  On June 10, 2010, the United States charged defendants, including Hui Hsiung, Hsuan Bin Chen, AU Optronics Corporation and AU Optronics Corporation America, with one count of conspiring to fix prices in violation of Section One of the Sherman Act, 15 U.S.C. § 1.  Mr. Chen and Mr. Hsiung are citizens of Taiwan and live in Taiwan.  AU Optronics Corporation is a Taiwanese corporation.

It is alleged that attendees at the Crystal Meetings exchanged information for the purpose of fixing prices.  These prices were then allegedly used in negotiations with customers around the world, including in the United States.

All TFT-LCD panels at issue in this case were manufactured outside the United States.  The panels were initially sold to "systems integrators" (SIs), either directly or through intermediate sales to "original equipment manufacturers."  Both the systems integrators and the original equipment manufacturers were foreign entities.  The panels were incorporated into consumer products such as televisions and monitors by the SIs.  The finished

3

products were then shipped around the world including, in some cases, to the United States.

The most important events at issue in this case, including the Crystal Meetings, took place in Taiwan and there is little doubt that the jurisdiction with the greatest connection to the case is Taiwan.

# ARGUMENT

## I.   SECTION ONE OF THE SHERMAN ACT SHOULD NOT BE APPLIED EXTRATERRITORIALLY IN CRIMINAL CASES

Central to this dispute is a tug-of-war between the long-standing presumption against extraterritoriality on one hand, and case law dealing with the extraterritorial reach of the Sherman Act on the other.  The ability of the United States to prosecute the defendants in this case turns on how this tug-of-war is resolved.

The presumption against extraterritoriality is well established, has been recognized by the United States for many decades, and remains vibrant today.  It is a "longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States."  *EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 248, 111 S.Ct. 1227 (1991) (hereinafter, "*Aramco*") (*quoting Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285, 69 S.Ct. 575 (1949)).  The presumption reflects the reality that Congress normally legislates with respect to domestic rather than foreign matters.  *Smith v. United States,* 507 U.S. 197, 204 n. 5, 113 S.Ct. 1178 (1993).  It has endured because without it courts may be applying laws to conduct that Congress never intended to regulate.  The presumption applies whether or not there is risk of conflict between American and foreign law.  *Sale v. Haitian Centers*

*Council, Inc.*, 509 U.S. 155, 173-74, 113 S.Ct. 2549 (1993).  It serves an important foreign-relations interest by "protect[ing] against unintended clashes between our laws and those of other nations which could result in international discord.  *Aramco,* 499 U.S. at 248.

   Perhaps most importantly for this case, the presumption against extraterritoriality ensures that courts should not seek to "'discern' whether Congress would have wanted" a statute to apply.  *Morrison v. National Australia Bank, Ltd.,* __ U.S. __, __, 130 S.Ct. 2869, 2878 (2010).

   The importance of the presumption was emphatically confirmed recently in *Morrison*, where the Supreme Court left no doubt that it is not only alive and well, but that lower courts must apply it forcefully, even when doing so is contrary to existing case law.  The Court dismissed decades of lower court jurisprudence that § 10 of the Securities Exchange Act of 1934 applied extraterritorially.  It instructed courts to instead rely on the presumption against extraterritoriality so as to better "preserv[e] a stable background against which Congress can legislate with predictable effects."  *Morrison*, 130 S.Ct. at 2881.

   The result in *Morrison* is not limited to the Securities Exchange Act of 1934.  The Court was very clear that the presumption against extraterritoriality must be applied in all areas.  Indeed, it is difficult to see how the Court could have been clearer.  Stating the general rule, the Court

6

says, "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Morrison*, 130 S.Ct. at 2878. Applying it to the facts of that case, the Court is equally straightforward, "there is no affirmative indication in the Exchange Act that § 10(b) applies extraterritorially, and we therefore conclude that it does not." *Id.* at 2883.

*Morrison* makes the extraterritoriality issue in this case straightforward, and should be enough to resolve the question in favor of Defendant-Appellants. To paraphrase *Morrison*, there is no affirmative indication in the Sherman Act that Section One applies extraterritorially, and it should therefore be concluded that it does not.

The Foreign Trade Antitrust Improvements Act ("FTAIA"), 15 U.S.C. § 6a, does nothing to change this conclusion. The FTAIA was adopted to insulate American exports from the Sherman Act. "[The FTAIA] is one of several bills introduced in the 97th Congress that seek to promote American exports." H.R. Rep. 97-686, at 2, *reprinted in* 1982 U.S.C.C.A.N. at 2487. "A perception exists among businessmen, especially small businessmen, that antitrust law prohibits efficiency-enhancing joint export activities." *Id.* at 4. "This bill will establish that restraints on export trade only violate the Sherman Act if they have a direct and substantial effect on commerce within the United States or a domestic firm competing for foreign trade." *Id.* at 7-8. "The law formalized American exporter immunity in U.S. courts for conduct

with purely foreign effects." Ian Simmons & Kenneth O'Rourke, *Reflections on Cartel Enforcement*, 27-FALL Antitrust 33, 37 (2012).

The objective of the FTAIA, then, was to limit the application of the Sherman Act, rather than expend it. "FTAIA's language and history suggest that Congress designed the FTAIA to clarify, perhaps to limit, but not to *expand* in any significant way, the Sherman Act's scope as applied to foreign commerce." *F. Hoffmann-La Roche Ltd. V. Empagran S.A.*, 542 U.S. 155, 169, 124 S.Ct. 2359 (2004) (emphasis in original). The same sentiment was expressed by the Court in *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 at n. 23, 113 S.Ct. 2891 (1993), "[t]he FTAIA was intended to exempt from the Sherman Act export transactions that did not injure the United States economy, and it is unclear how it might apply to the conduct here." Nothing in the language of the FTAIA or its legislative history provide any indication of Congressional intent that the Sherman Act allows for the criminal prosecution of contracts, combinations or conspiracies occurring outside the boundaries of the United States.

This Court, of course, cannot disregard *Hartford Fire*, but that case must be viewed in light of the facts and context in which it was decided and in light of *Morrison*. Though *Hartford Fire* applied the Sherman Act to conduct that took place outside the United States, it did so only in the civil context, and did so simply by observing that "it is well established by now

8

that the Sherman Act applies to foreign conduct." *Hartford Fire*, 509 U.S. at 796. In its decision, the Court does not so much as mention the presumption against extraterritoriality and carries out no analysis of the extraterritoriality question, choosing instead to simply accept the extraterritorial application of the law. In contrast, *Morrison* provides an explicit and carefully reasoned approach to the matter, leaving no doubt that the presumption against extraterritoriality must be applied. The central role given to the presumption against extraterritoriality in *Morrison* cannot be reconciled with *Hartford Fire*. It follows that *Hartford Fire* is no longer good law on the question of the extraterritorial application of the Sherman Act.

Even if the Court were to conclude that *Hartford Fire* permits the extraterritorial application of the Sherman Act in a civil case, more would be required to apply it in the case at hand. *Hartford Fire* was a civil case. Indeed, the entire line of jurisprudence on the reach of American antitrust laws – from *American Banana* to *Alcoa* to *Hartford Fire* – was been developed in the context of civil disputes, and *Hartford Fire* itself cites no criminal cases. There is no reason to think that the same results would have been reached in the criminal context. Indeed, there are good reasons to think the opposite.

The importance of the presumption against territoriality in the criminal context was clear long before *Morrison*. "If [criminal]

9

punishment . . . is to be extended to include [acts] committed outside of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard." *United States v. Bowman*, 260 U.S. 94, 98, 43 S.Ct. 39 (1922).  If the presumption, as clarified in *Morrison*, is not enough to prevent extraterritorial application in civil cases, it should nevertheless do so in criminal cases.  "[I]n the case of regulatory statues that may give rise to both civil and criminal liability, such as the United States antitrust and securities laws, the presence of substantial foreign elements will ordinarily weigh against application of criminal law.  In such cases, legislative intent to subject conduct outside the state's territory to its criminal laws should be found only on the basis of express statement or clear implication." Restatement (Third) of Foreign Relations Law § 403 cmt. f (1987).

Even if *Hartford Fire* was considered enough to overcome *Morrison*, it does not speak to criminal law cases because it is only a civil case.  *See United States v. United States Gypsum Co.*, 438 U.S. 422, 435, 98 S.Ct. 2864 (1978) (concluding that Section One of the Sherman Act has a different meaning with respect to *mens rea* requirements in the criminal context than in the civil context, and rejecting use of a civil case to support the opposite position).  It has generally been the case that "[c]ourts have interpreted criminal and civil aspects of the Sherman Act separately."

10

Phillip E. Areeda & Herbert Hovemkamp, II Antitrust Law ¶ 303c, p.42 (3d ed. 2006).

## II.  PRINCIPLES OF INTERNATIONAL LAW AND INTERNATIONAL COMITY COUNSEL AGAINST CRIMINAL SANCTIONS BEING APPLIED AGAINST THESE TAIWANESE INDIVIDUALS FOR ACTIONS TAKEN IN TAIWAN

It is well established that "statutes should not be interpreted to regulate foreign persons or conduct if that regulation would conflict with principles of international law." *Hartford Fire* at 816 (Scalia, J., dissenting). This interpretive practice is sometimes referred to as the *Charming Betsy* canon of interpretation.  "[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains," *Murray* v. *The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804) (Marshall, C.J.); *see also United States* v. *Neil*, 312 F.3d 419, 421 (9th Cir. 2002) (recognizing that extraterritorial application of penal laws must "compor[t] with principles of international law").

The application of a nation's criminal law to activities abroad is a particularly sensitive issue in international relations because it compromises fundamental notions of territorial sovereignty.  For this reason it is highly disfavored under the law of nations.

> "[T]he exercise of criminal (as distinguished from civil)
> jurisdiction in relation to acts committed in another state may

be perceived as particularly intrusive. . . .  Apart from exercises of jurisdiction under the special 'protective principle,' for example to punish fraud on immigration authorities, the exercise of criminal jurisdiction with respect to conduct outside the state's territory has been infrequent.  Prosecutions for activities committed in a foreign state have generally been limited to serious and universally condemned offenses, such as treason or traffic in narcotics, and to offense by or against military forces.  In such cases the state in whose territory the act occurs is not likely to object."  Restatement (Third) of Foreign Relations Law § 403, Reporters' Note 8 (1986).

An especially high degree of caution should be exercised before extending extraterritorial application of criminal laws intended to regulate private economic activity.  In these areas – and certainly in the antitrust area – criminal sanctions are rarely used by other nations and foreign parties may not be able to foresee that their conduct would expose them to such penalties.[3]

The *Charming Betsy* canon should be enough to resist the extraterritorial application of criminal law in this case, but there are, in addition, sound reasons to refrain from doing so based on notions of international comity of nations.  Comity is a distinct notion from the *Charming Betsy* canon.  The latter reflects the respect American law and

---

[3] James A. Wilson, *Extradition: The New Sword or the Mouse That Roared?*, Antitrust Source, Apr. 2011, at 3 ("[T]he number of jurisdictions that have adopted criminal sanctions for antitrust violations (*e.g.*, hard core cartel conduct) remains relatively small.").

courts show international law, while the former reflects the respect shown to foreign states.

The comity of nations at issue here is not the "comity of courts," based on which judges may decline to exercise jurisdiction over matters best judged elsewhere. It concerns, instead, the respect sovereign nations afford one another by limiting the reach of their laws. It is exercised by legislatures when laws are enacted, and courts interpret laws accordingly. *Hartford Fire*, at 2920 (Scalia, J., dissenting). This form of comity, then, is simply part of determining whether the Sherman Act prohibits the conduct at issue. *Id.* Because this form of comity speaks to the meaning of laws adopted through the legislative process it is appropriately interpreted by the courts. The government cannot unilaterally determine how that analysis should be concluded.

The principle of international comity has lo ng been recognized by United States courts. *Hilton v. Guyot*, 159 U.S. 113, 163-64 (1895). Comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *Id.*

A threshold question for comity analysis is raised by *Hartford Fire*, where the Court states that a comity analysis is required only when there is a

13

"true conflict" between domestic and foreign law. *Hartford Fire*, at 2910.
Furthermore, the Court concludes that no true conflict exists "where a
person subject to regulation by both states can comply with the laws of both."
*Id.* (*quoting* Restatement (Third) Foreign Relations Law § 403, cmt. e). This
Court addressed the implications of *Hartford Fire* in *Metro Industries, Inc. v.*
*Sammi Corp.*, 82 F.3d 839, 846 n.5 (9th Cir. 1996), clarifying that there
remains room for a comity analysis in some cases. *Id.* at 846, n. 5.

Whatever the ultimate implications of *Hartford Fire* and *Metro*
*Industries* for comity analysis in civil cases, it remains appropriate to apply
such an analysis in a criminal case such as the one before the Court. The
Court in *Hartford Fire* was careful not to close to door to the use of comity
analysis in all situations. "We have no need in this litigation to address other
considerations that might inform a decision to refrain from the exercise of
jurisdiction on grounds of international comity." *Hartford Fire*, at 2911.
The particularities of a criminal prosecution and, in particular, the strong
reasons for restraint when applying criminal laws to conduct abroad are
precisely the kind of "other considerations" that were absent in *Hartford*
*Fire* and that make a comity analysis appropriate.

Taiwan is not alone in feeling that such aggressive intrusion into its
regulatory sphere is unjustified. Many countries have responded negatively
to extraterritorial application of American antitrust laws with diplomatic

14

protests, foreign blocking statutes, anti-suit injunctions, and other criticisms. *See* Gary B. Born & Peter B. Rutledge, International Civil Litigation in United States Courts 648 (4th ed. 2007). "Yankee 'jurisdictional jingoism' has created wide-spread resentment and prompted America's closest allies to retaliate by adopting legislation limiting the reach of the Sherman Act in foreign jurisdictions." John B. Sandage, *Forum Non Conveniens and the Extraterritorial Application of United States Antitrust Law*, 94 Yale L. J. 1693, 1698 (1985) (internal citations omitted). The Netherlands, the United Kingdom, Germany, France, Norway, Belgium, Sweden, Australia, Canada, and South Africa have all enacted blocking legislation in response to the extraterritorial application of United States laws. William Dodge, *Extraterritoriality and Conflict-of-Laws Theory: An Argument for Judicial Unilateralism*, 39 Harv. Int'l L. J. 101, 164 (1998). By way of example, the United Kingdom's Protection of Trading Interests Act, (U.K.), 1980, c.11, *reprinted* in 959 Antitrust & trade Reg. Rep. (BNA) F-1 (April 10, 1980) prevents enforcement of awards that grant "multiple damages" and provides parties in the United Kingdom with a clawback remedy by which they can recover from a United States party, in British courts, two-thirds of any United States antitrust award.

The foreign objections noted above relate to the extraterritorial application of United States antitrust laws in *civil* cases. The objections

have been especially acute with respect to particulars of United States law that are alien to most foreign systems, including the use of treble damages and demanding discovery standards.  Born & Routledge, *supra* at 649.  The extraterritorial application of criminal sanctions would represent both a further compromise of the ability of foreign states to regulate within their own territories and an application, within those territories, of an approach to economic regulation (the use of criminal sanctions) that is unusual and disfavored internationally.

In this case the intrusion on Taiwanese sovereignty and on Taiwan's ability to regulate its economy is manifest.  The United States Government seeks to impose crippling liability on a Taiwanese corporation and to remove Taiwanese nationals from their country of citizenship and residence to imprison them for years in United States prisons.  Such actions are contrary to Taiwanese law which, consistent with most competition laws in developed countries, disfavors criminal sanctions.  In Taiwan criminal sanctions are considered "measures of last resort."  Taiwan Fair Trade Comm'n, Explanatory Material Relevant to the Revised Articles of the Fair Trade Act, § 3.1 (1999).

## III.   EXTRATERRITORIAL APPLICATION OF THE SHERMAN ACT UNDER THESE FACTS IS CONTRARY TO SOUND POLICY AND SENSIBLE REGULATION OF GLOBAL COMMERCE

A great deal of business activity crosses national borders.  When this occurs, many states may be tempted to regulate the activity.  In the case at hand, the most directly involved country is clearly Taiwan.  It has the greatest interest in the activity, and should be the primary regulatory jurisdiction.  Taiwan's interest goes beyond a desire to have its laws complied with.  Laws and regulations are not simply tools to prohibit harmful activity.  They are also tools to permit desirable activity.  When foreign law forbids activity that the laws of Taiwan deem permissible, there is an infringement of their sovereign authority.  The United States has an interest in ensuring that citizens are able to express themselves freely, but does not generally make it mandatory to do.  Foreign restrictions on the ability of Americans to exercise their right to free speech in the United States implicate American interests, even though they do not require a violation of American laws.

Taiwan has a modern and comprehensive legal regime to enforce competition laws and curb anti-competitive behavior, including price-fixing. *See, e.g*., Fair Trade Act of 2011 of Taiwan, Arts. 7, 14.  In developing those laws it has made policy judgments about how to balance competing

priorities and has crafting legal rules accordingly.  Taiwan has also made

judgments about appropriate sanctions when those rules are violated.

Taiwanese laws, then, reflect decisions about what should be prohibited and,

importantly, what should be permitted.  In this particular case, the

Taiwanese FTC investigated the events in question but concluded that no

action was appropriate.  Like any market economy, Taiwan benefits when

private entities and individuals have the freedom to conduct business activity

in whatever way they wish, as long as they comply with the law.  If the

United States or other foreign states apply their own laws extraterritorially to

Taiwanese individuals and firms, the resulting legal constraints hurt both

those actors and the interests of Taiwan.

    Put another way, if the United States or any other foreign state applies

its law to conduct taking place in Taiwan, it upsets the balance struck by that

nation's lawmakers.  For this reason, extraterritorial application of United

States antitrust law will inevitably give rise to conflicts with the application

of Taiwanese law and interests.

    One need not speculate as to whether states other than Taiwan take the

view that their own regulatory balance is at risk because precisely that

argument has been made in United States courts in the past.  In *Empagran,*

for example, the court observes that "several foreign nations have filed

briefs here arguing that to apply our remedies would unjustifiably . . . upset[]

a balance of competing considerations that their own domestic antitrust law embody." *Empagran*, 542 U.S. at 2368.[4]

If the court applies United States criminal law extraterritorially in this case, business activity in Taiwan would be required to comply with *both* American and Taiwanese legal rules. The *de facto* legal regime governing antitrust would consist of the most burdensome elements of each individual regime and, taken as a whole, would be more restrictive than either the American or the Taiwanese system. The problem only gets worse if other nations follow suit. A global company doing business in Taiwan could plausibly find itself subject to the laws of many foreign states. Each individual legal system balances the advantages of a free market against the need to regulate anti-competitive conduct, and each does so in a different way. Collectively, however, they create a web of obligations and prohibitions that is far more burdensome and far less rational than any individual nation's rules.

Finally, a decision to respect the presumption against extraterritoriality would hardly leave the conduct unregulated. As already mentioned, Taiwan has a developed set of laws governing anti-competitive behavior. *See* Fair Trade Act of 2011 of Taiwan. If, for any reason,

---

[4] *Amicus* briefs were filed by Canada, Germany and Belgium (together), Japan and the United Kingdom and Ireland (together).

Congress were to decide that extraterritorial application is warranted, they could, of course, enact legislation to that effect. Indeed, if the Courts decline to apply the law extraterritorially, and if this is an error in the eyes of Congress, the legislature has every incentive to issue corrective legislation so as to protect American consumers or businesses. If, on the other hand, the law is applied extraterritorially when it should not be, Congress is much less likely to step in with a correction because the harms from the error will be felt primarily by individuals and firms abroad, as is happening in this case.

In other words, if the Court is in equipoise on the question of extraterritoriality, the more prudent course of action is to deny extraterritorial application because, should that decision be in error, it is more likely to be corrected by Congress.

## IV.    COOPERATION AND CONSULTATION

Globalization of business activity inevitably creates challenges for national legal systems. Conflicts among jurisdictions are inevitable. If states give in to the temptation to apply their laws extraterritorially, many of the benefits of international business activity will be suffocated by overlapping and inconsistent systems of regulation.

The solution to this problem will not be found in the courts. It can only be achieved through cooperative efforts among states. This is precisely what has happened in the antitrust field. Both the Department of Justice and

the Federal Trade Commission participate in the International Competition Network, a venue for antitrust officials to communicate with one another and discuss matters of common interest.  The Department of Justice has also entered into numerous Memoranda of Understanding between themselves and the antitrust authorities in foreign nations.[5]  Like the United States, Taiwan participates in the International Competition network and has a set of bilateral cooperative agreements.[6]

These existing efforts demonstrate that cooperation in the area of antirust is not only possible, but also ongoing.  They are the most promising strategy for addressing the challenges inherent in efforts to regulate global activity with national laws.

---

[5] Partner nations are Australia, Brazil, Canada, Chile, China, European Union, Germany, India, Israel, Japan, Mexico, and Russia.  See United States Department of Justice website, Antitrust Division, http://www.justice.gov/atr/public/international/int-arrangements.html.

[6] Partner nations are Australia, Canada, Hungary, France, Mongolia, and New Zealand.  See Taiwan Fair Trade Commission website, http://www.ftc.gov.tw/internet/english/doc/docList.aspx?uid=1075.

## V.    CONCLUSION

For the foregoing reasons, *Amicus* urges the Court to hold, in light of the presumption against extraterritoriality as clarified in *Morrison,* the particular intrusion that would be caused by the extension of criminal laws to foreign activities, and principles of international law and comity, that the Sherman Act should not be applied extraterritorially in the case at hand.

DATED:  February 11, 2013                Respectfully submitted,

s/ Chang C. Chen
Dr. Chang C. Chen
The Law Offices of Dr. Chang C.
Chen
500 Bryant Street, Suite 104
San Francisco, CA 94107
Telephone: (415) 990-1858
Facsimile: (714) 795-2995

s/ John Shaeffer
John Shaeffer
Carole E. Handler
LATHROP & GAGE LLP
1888 Century Park East, Suite 1000
Los Angeles, CA 90067

s/ Sang N. Dang
Sang N. Dang
Andrew B. Chen
BLUE CAPITAL LAW FIRM, PC
600 Anton Boulevard, Suite 1000
Costa Mesa, CA 92626
Telephone: (714) 839-3800
Facsimile: (714) 795-2995

Counsel for *Amicus Curiae*
PROFESSOR ANDREW GUZMAN

22

## <u>CERTIFICATE OF COMPLIANCE</u>

I am an attorney for *amicus curiae* the Professor Andrew T. Guzman.

Pursuant to Fed.R.App.P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, I hereby

certify that the foregoing brief of amicus curiae is in 14-point,

proportionately spaced Times New Roman type. According to the word

processing system used to prepare this brief (Microsoft Word 2010), the

word count of the brief is 4,539, not including the table of contents, table of

authorities, certificate of service, and this certificate of compliance.

Date: February 11, 2013                     /s/ Chang Chen
                                            Chang Chen

23

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11 day of February 2013, I electronically filed the brief of *amicus curiae* the Andrew T. Guzman with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Chang Chen
Chang Chen

24